. FAULKNER v. KAPLON et ux.

(District Court, E. D. North Carolina. March 3, 1913.)

No. 347.

1. BANKRUPTCY (§ 178*)—FRAUDULENT CONVEYANCES—SALE BY ASSIGNEE— FRAUD—EVIDENCE.

In a suit by bankrupt's trustee to recover goods sold by the bankrupt's assignees to the bankrupt's daughter and his wife's nephew for fifty per cent. of the inventoried cost, evidence *held* to require a finding that the sales were fraudulent and for the benefit of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 221, 264–274, 283, 284; Dec. Dig. § 178.*]

2. BANKRUPTCY (§ 279*)—FRAUDULENT TRANSFERS—ACTIONS—ESTOPPEL.

Where a sale of bankrupt's stocks of goods by his assignees for the benefit of creditors was claimed to be fraudulent and void by the bankrupt's trustee, and the assignees were directed to pay the proceeds of the sale into the bankruptcy court to await the final decree in bank-

ruptcy proceedings, the only effect of such order was to place the money in custodia legis to be disposed of as should be decreed on the final disposition of the case, and did not estop the trustee from suing to set aside the sales as fraudulent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 419-421; Dec. Dig. § 279.*]

In Bankruptcy. Suit by C. J. Faulkner, as trustee in bankruptcy of Moses Kaplon, against Saul Kaplon and wife. Decree for complainant.

John W. Hinsdale, of Raleigh, N. C., J. G. Mills, of Wake Forest, N. C., and Faulkner & Faulkner, of Boydton, Va., for plaintiff.

N. Y. Gulley, of Wake Forest, N. C., and James H. Pou, of Raleigh, N. C., for defendants.

CONNOR, District Judge. [1] The plaintiff alleges: That Moses Kaplon, trading under the firm name of Moses Kaplon & Co., was duly adjudged a bankrupt by the District Court of the United States for the Eastern District of Virginia, and that he was elected and duly qualified as trustee of said bankrupt. That defendant Saul Kaplon and his wife, Bessy, were at the time of said adjudication, and are now, residents of the town of Wake Forest, in the Eastern District of North Carolina. That prior to his adjudication in bankruptcy the said Moses Kaplon was engaged in the mercantile business in the said town of Wake Forest and in Chase City, in the state of Virginia, having in each of said places a stock of goods, wares, and merchandise. That on December 26, 1911, said bankrupt executed to D. Gulley, Esq., an assignment, whereby he transferred and assigned to him his entire stock of goods, and all his other assets in Wake Forest, N. C., for the benefit of his creditors, and on December 27, 1911, he executed to T. D. Jeffries, Esq., an assignment whereby he assigned and transferred to him his entire stock of goods, etc., in Chase City, Va., for the benefit of his creditors. The said deeds of assignment were duly recorded, and the assignees took said property into their possession and made inventories thereof. That the assignee, T. D. Jeffries, on January 4, 1912, sold the stock of goods assigned to him to one Adolph Aarons of New York at the price of 50 cents on the dollar of the inventoried cost thereof. That said assignee gave no notice of his purpose to sell said stock of goods, although there were several other parties who were desirous of purchasing at a price in advance of that received from Aarons. Plaintiff, upon information and belief, charges that, while said purchase was pretended to be made by Adolph Aarons, it was in truth and fact made by Moses Kaplon the bankrupt, and paid for by money belonging to said bankrupt, which should have been surrendered by him as a part of his assets. That said Kaplon has continued in possession of said goods, exercising ownership over them, etc. That D. Gulley, Esq., the assignee of the stock of goods at Wake Forest on January 8, 1912, immediately upon the expiration of 10 days, being the time fixed by the North Carolina statute, before which an assignee is not permitted to sell the property assigned, without giving any notice of his intention to make sale, sold the entire stock as-

signed to him by Moses Kaplon to defendant Bessy Kaplon, wife of defendant Saul Kaplon, the son of said Moses Kaplon, for 50 cents on the dollar of the inventoried price of said goods. That said goods are worth much more than the price for which they were sold. Plaintiff alleges upon information and belief that, while said purchase was pretended to be made by said Bessy Kaplon, it was in truth made by said bankrupt or by said Bessy Kaplon with money belonging to said bankrupt. That said Saul and Bessy Kaplon had been in the sole management and control of said store, stock, and business at Wake Forest, purchasing and selling goods as they saw fit, rendering to said Moses Kaplon no account of their transactions. Plaintiff charges that the money with which defendant Bessy Kaplon paid the assignee for said stock of goods was derived from the proceeds of the business conducted by her husband and herself prior to the adjudication of said Moses Kaplon. Plaintiff further charges, upon information and belief, that the alleged purchase of the stocks of goods by Adolph Aarons and Bessy Kaplon at Chase City and Wake Forest, respectively, was the result and consummation of a conspiracy entered into before the execution of the said deeds of assignment by Moses Kaplon by and between the said Moses Kaplon, his brother and assistant Max Kaplon at Chase City, Saul Kaplon, his son, and wife, Bessy Kaplon, Adolph Aarons, the nephew of the wife of said Moses and Joseph L. Balkind, another kinsman of his wife, and Louis Applefield, by which it was planned and determined that said Moses Kaplon should make said deeds of assignment, have the goods sold privately without any competition, purchase the same for the said Moses Kaplon, but in the name of some other person, at less than one-half of the value thereof, pay for the same with the money theretofore derived from the sale of said goods in the regular course of business, which money should have gone to the creditors of Moses Kaplon in payment of debts due them for said goods, etc. Plaintiff made further charges respecting the manner in which defendants were at the date of filing the bill disposing of the goods, etc., as the basis for injunctive relief pending the hearing, etc. This suit is prosecuted only against defendant Saul Kaplon and his wife Bessy, residents of this district, wherein the property in controversy is situate. The bill concludes with prayer for process and appropriate relief. Defendants filed their joint answer, admitting that Moses Kaplon was adjudged a bankrupt, and that plaintiff was his trustee—the execution of the deeds of assignment—the manner of conducting the business at Wake Forest, N. C., and the purchase of the stock by defendant Bessy Kaplon from the assignee. They deny that the goods were sold without notice to others, and allege that the assignee made several efforts to obtain a higher price for said goods; that the best price offered him was 30 cents on the dollar; that a portion of the goods in said stock was old, etc. They allege that the price paid by defendant Bessy Kaplon for said goods was more than their real value. She expressed her readiness to surrender such part of said goods as were on hand at the time of filing the bill and an accounting for the balance if the amount paid by her is refunded. She avers that no part of the money paid by her for said goods belonged to Moses Kaplon, but that all of said money belonged to her, the

said Bessy Kaplon; that of the amount $3,723.29, paid for said goods, she borrowed $2,100 from one Louis Applefield, and the balance thereof was a part of the sum of $6,000 given to her by her father, S. W. Levine, of Chicago, Ill., as her "marriage portion." She states that a portion of said sum was deposited in the Kennaway Trust & Savings Bank of Chicago, a part in the Illinois Trust & Savings Bank, and a part kept by her in cash. The defendants expressly deny any and all allegations charging a conspiracy between Moses Kaplon and themselves. They deny having any knowledge in respect to the transaction at Chase City, etc. The defendants deny that they were attempting to dispose of said goods otherwise than in the usual and ordinary way, admitting that during the dull season they were advertising sales, that they intended removing from Wake Forest to some larger town in the eastern section of the state, where trade conditions were better. Defendants further allege that plaintiff trustee, having received the amount paid by her to D. Gulley, Esq., assignee, as the purchase money for said goods, is estopped from attacking the purchase thereof by her, etc. They expressly and explicitly deny any and all manner of fraud, combination, or conspiracy on their part in regard to the entire transaction. Plaintiff filed a general replication, etc. It appears that, after the appointment of plaintiff as trustee in bankruptcy of Moses Kaplon, he obtained from the court, without objection, an order directing the assignee to pay the amount received by him from the sale of the stock of goods into the registry of the District Court for the Eastern District of Virginia, which was done. Plaintiff proceeded to take the depositions in support of his bill, and upon the completion thereof the cause was set down for hearing. Defendants took no testimony. The testimony is found in a large mass of examinations had before a commissioner appointed by Judge Waddill, depositions taken under commissions from this court, and many exhibits.

It appears that Moses Kaplon at and prior to the execution of the deeds of assignment to Mr. Gulley and Mr. Jeffries resided at Chase City, Va. His son, Saul Kaplon, and his wife, Bessy Kaplon, resided at Wake Forest, N. C. Bessy Kaplon is the daughter of S. L. Levine of Chicago, Ill. Saul Kaplon married her in Chicago, August, 1907, and during the month of March, 1910, they went to Wake Forest, taking charge of the business, then opened, for Moses Kaplon, under the name of M. Kaplon & Co. The larger part of the stock of goods with which the business was begun was shipped from Chase City, Va. Saul Kaplon and his wife had absolute control of the business, bought and sold goods, received and paid out money, executed notes, deposited money in bank, checking it out as they saw fit. They did not at any time render to Moses Kaplon any account of the money received and paid out, or the manner in which they conducted said business; nor did they keep any books of account except their bank book and invoices when paid. They paid but small sums of money received from said business to Moses Kaplon, and of these they kept no account. They were to receive for their services, in conducting said business, $100 a month and all of their expenses, including house rent, groceries, traveling expenses, and "anything that was necessary to keep us up." On August 19, 1911, defendant Saul Kaplon made in his own hand-

writing, and signed, the name of M. Kaplon & Co. to a statement which he sent to R. G. Dun & Co. and Bradstreet & Co. "as a basis of credit," showing the financial condition of said M. Kaplon & Co. "from inventory of July 25, 1911," by which it appeared that he had "Merchandise on hand $8,200. Bills Receivable and accounts $155. Cash in Bank $400. Other personal property consisting of Mdse. at Chase City, Va. From Inventory of July 20, 1911, $11,750. Total available assets $20,500. Liabilities for Merchandise not due $1,094. For Merchandise past due $327.50. Loans from bank $300. Liability of Chase City Store $2,750.00. Net worth $16,033.50." Between September 1 and December 27, 1911, they bought goods for the Wake Forest Store amounting to $11,135.85. The total amount of inventory, as taken by the assignee immediately after the execution of the assignment, was $7,506.58. Plaintiff introduced a large number of telegrams to and from defendant Saul Kaplon, Bessy Kaplon, Adolph Aarons, Joseph L. Balkind of New York, Moses Kaplon and Max Kaplon, all of them sent either to or from Wake Forest, New York, or Rutherfordton, N. C. They bear date during the months of October, November, December, 1911, and January and February, 1912. While the language of many of them is obscure, it is manifest that the large majority of them relate to the business of Moses Kaplon & Co. at Wake Forest and some of them to his business at Chase City. It is not practicable to set out all of the telegrams in full, but a reference to them clearly indicates that they relate to negotiations between these parties in regard to the business of M. Kaplon & Co. and the disposition of the stock of goods at Wake Forest and Chase City. The parties to the telegrams are all related, either by blood or marriage. They indicate that several of the parties are moving about between Chase City, Wake Forest, and other points. Many of them are sent by defendant Bessy to Saul Kaplon, who it appears has removed portions of the goods to Hillsboro, Rutherfordton, and Zebulon. In these telegrams his wife and his father urge him to return to Wake Forest and to send the goods there. These bear date December 25th and 26th. A number of telegrams to and from G. W. Groves & Co., Buffalo, N. Y., indicate a purpose to have a "rush special sale" of the goods which, for some reason, was not successful. On December 11, 1911, Bessy Kaplon wires her husband at Rutherfordton, "Don't come until I tell you Father and Balkind are here." On the next day Balkind wires from Wake Forest to Aarons, N. Y.:

"Send Dorfman at once, very important, train leaves twelve thirty and two to-day. Wire answer. Will take two days here."

On same day Moses Kaplon, from Wake Forest, wires Max Kaplon at Chase City:

"Cannot come home before Wednesday—look after business, get all help needed, get out circulars."

On December 12th Saul Kaplon, from Rutherfordton, wires Balkind at Wake Forest:

"Will be at Wake Forest to-night."

On same day Aarons, from New York, wires Balkind at Wake Forest:

"Dorfman leaves to-day on two o'clock train."

Dorfman was a cousin of Saul Kaplon. There is evidence that Balkind and Dorfman looked over, and took an inventory of, the stock of goods. On December 31st M. Kaplon, from Wake Forest, wires Balkind at Brooklyn, N. Y.:

"Come at once to Chase City. Stock for sale at Chase City. Will be home to-morrow."

On January 4th Balkind from New York wires Aarons at Wake Forest:

"You need not stay for sale. They can buy it themselves. Prefer your name not to be mentioned, apt to be complications. Will send Lemson if possible. Rosenthal and others are going to fight."

On same day Aarons, from Wake Forest, wires Balkind at New York:

"Must I come home. If I leave I am sure they will not get the stock. Can buy on some other name—answer if I should come home. Can leave to-night."

On January 6th Saul Kaplon, from Wake Forest, wires Aarons at New York:

"You or Mr. Balkind come at once. Stock to be sold Monday."

On January 7th Aarons wires Saul:

"Must postpone sale till Monday—impossible to come over. See Mr. Professor."

On January 8th Aarons from New York wires Prof. Gulley·

"Will give thirty cents on dollar for stock of Kaplon."

On same day he wires Saul:

"Must I come to-day. Answer immediately at home address."

On same day he wires Saul:

"Have wired Prof. G. per your letter; answer if sale postponed, then I will leave to-night, expect money from Applefield Tuesday in Wake Forest."

On same day defendant Bessy, from Wake Forest, wires M. Kaplon Chase City:

"Everything all right. I bought stock same price Chase City."

On same day M. Kaplon, from Wake Forest, wires Aarons, at Brooklyn, N. Y.:

"Not necessary for you to come. Bessy Kaplon bought stock same price as Chase City. Need one thousand. Send at once."

On same day, Bessy, from Wake Forest, wires her sister Mrs. E. H. Flowers, Chicago, Ill.:

"Have just bought stock under my name, paid 50 cents on dollar. Did not use check you sent; will bring it home. We may leave Sunday. It is snowing. Love to all—tell Pa and Ma."

On January 9th M. Kaplon from Wake Forest wires Aarons at New York:

"Don't send man until further notice. Bad weather."

It is in evidence that the assignee, both at Wake Forest and at Chase City, made the sales upon the advice of the counsel for Moses Kaplon. From the foregoing and other evidence, appearing in the examination of Saul and Bessy Kaplon, it is manifest that the business of Moses Kaplon & Co., at Wake Forest, was conducted exclusively by them and that, as between them, defendant Bessy was the controlling spirit. She spent a large part of her time in the active management of the business. Her husband was during the time intervening, between March, 1910, and December, 1911, traveling about, endeavoring to establish branch stores at Zebulon, Hillsboro, and Rutherfordton. This is shown by his own testimony, other witnesses examined and the telegrams. It appears that the statement made to Bradstreet was recalled. In his several examinations regarding these statements Saul makes many contradictory statements. It is impossible to draw any very satisfactory conclusions from his testimony in regard to the statements. It is apparent that they were made with either a purpose to deceive and obtain a very much larger line of credit than he was entitled to, or with a reckless disregard of the truth. If he had a stock of goods, inventoried on July 25, 1911, at $8,200, as he stated, it is impossible to understand what became of them between that date and the date of the inventory taken by the assignee about January 4, 1912. It is conceded that they purchased during the fall season of 1911 goods amounting to $11,135.85. This amount added to $8,200 makes $19,355.85. The amount deposited in bank during the same period representing, they say, the amount of cash sales, is $5,284.80. They sold nothing on credit. Assuming that the goods were sold at cost, although they say that they were sold for a profit, there should have been on hand December 26, 1911, approximately, goods of the value of $14,071. No cash or balance in bank nor accounts payable were delivered to the assignee. The inventory shows goods of but $7,506 value, thus showing a shortage of $6,565. Mr. D. Gulley, who is an attorney, says that he has no special knowledge of the prices of goods. He also says that Saul Kaplon alone assisted him in taking the inventory, calling out the prices—that it was taken "in a very general way." Plaintiff insists that the real value of the goods was very much in excess of the inventory. I think it very probable that the statement made by Saul Kaplon in regard to the value of the goods on hand August 19, 1911, is false, but to what extent it is impossible to even conjecture. His testimony indicates either a reckless disregard of the truth or a disordered mind. Whether true or not that the statement made to commercial agencies had the effect of giving to them a large credit is evidenced by the amount of debts proven against Moses Kaplon & Co. in bankruptcy for goods purchased subsequent to the statement. Of the amount deposited in bank only $2,435 was paid on account of debts. Saul and his wife were to receive $100 per month and ex-

penses for their services. Their family consisted of themselves and one infant. Without undertaking to unravel this tangled thread or explain this very peculiar manner of conducting a mercantile business of the size and character disclosed by the testimony, it is manifest that Saul and Bessy Kaplon, and their father, Moses Kaplon, are the only persons who are capable of explaining very much which in the light of results calls for explanation. There was either gross misrepresentation of the condition of the business on August 19, 1911, or a very large shortage in available assets at the time the property went into the possession of the assignee or a large sale of goods for cash which went into the possession of Saul Kaplon and his wife, unaccounted for by them. It seems that they did not receive the amount to be paid them for services. Saul proves a claim of $1,000 against his father for balance due on account of services. The telegrams put in evidence tend strongly to show that during the latter part of November, 1911, Moses Kaplon & Co., or Saul and his wife, conceived the purpose of having a "rush or special sale" and sought the services of a firm in Buffalo, N. Y., for that purpose. It is not clear to what extent this purpose was executed. The man sent out to conduct the sales appears not to have given satisfaction. The last telegram, relating to this phase of the transaction, bears date December 8, 1911. "Don't send man; you've fooled too many times." This was evidently sent by Bessy Kaplon, because on the 9th December she wires M. Kaplon at Chase City: "Be sure to come to-morrow—Sunday. Bessy." And on the 11th December to her husband at Rutherfordton not to come "until I tell you Father and Balkind here." It is not clear, because of the absence of any punctuation, whether this wire should be understood as a statement that her father and Balkind are then at Wake Forest, or as a direction to her husband not to come until she tells him that they are there. The next telegram, December 11th, from Balkind to Aarons, shows that the former was at Wake Forest on that day, and that Moses Kaplon was there on the 12th December. From that day until the business is brought to a conclusion by the execution of the deeds of assignment, the sale of the stock to Adolph Aarons at Chase City and to Bessy Kaplon at Wake Forest, the telegrams show that Balkind, Aarons, and Moses Kaplon are in constant communication in regard in disposing of both stocks of goods. Without attributing to the assignees any complicity with, or knowledge of, the purpose on the part of Moses Kaplon to bring about sales of these stocks to the persons selected by himself, it is manifest that there was undue haste in making the sales. They both state they were made under the advice of the counsel for Moses Kaplon. Keeping in mind the relationship of these parties, the significant language of the telegrams, the manner in which the business at Wake Forest was conducted, the statement made by Saul on August 19, 1911, his absolute indifference to or disregard of its truth, the margin between the value of the goods stated to be on hand in August, 1911, those purchased between that date, and December 27th of that year, and those found in the store at the date of the assignment, the failure on the part of Saul Kaplon and his wife to render any account of the

business, their contradictory statements made upon their several examinations, and many other facts and circumstances found in the conduct of the parties concerned, call upon the defendants to explain the transactions which, in four months, resulted in converting a business, which Saul Kaplon stated was not only amply solvent, but carried a large amount of "net available assets" into insolvency, and a series of transactions thereafter resulting in putting into the possession of Bessy Kaplon the stocks of goods representing purchases in four months of some $12,000, inventoried at $7,500, for $3,750. The series of transactions disclosed, with these results, call for a frank, full, and corroborated explanation to overcome the presumptions which arise from the facts and circumstances recited.

To meet the case thus made by plaintiff, defendants rely upon the testimony of Bessy Kaplon, introduced by plaintiff, insisting that it shows the sources from which she obtained the money with which she paid for the Wake Forest stock of goods, and explains the entire transaction consistently with honesty and good faith. Bessy Kaplon was examined before a commissioner. She says that her father gave her, as her "marriage portion," $6,000, a part of which she had deposited in certain banks, named by her, in Chicago, and a part was left with him, the balance she kept in her trunk. She further says that her sister, Mrs. E. H. Flowers, residing in Chicago, sent her on January 6, 1912, $1,547. In this statement she is corroborated by a telegram from her sister of that date. Her telegram of January 6th says: "Just mailed $1547—some hustling to-day." Bessy Kaplon says that this amount was sent in three checks, one for $1,000, which she sent back to her sister in a few days, that she returned the $1,000 check, depositing $547. The bank book shows a deposit by Bessy Kaplon January 9th of $1,-615; that, when she wrote her sister for it, she did not tell her for what purpose she wanted it; that she did not want it to buy the stock. Her sister was examined in Chicago, and says that she sent to Bessy Kaplon a draft for $1,547; that she got it from a bank in Chicago, the name of which she cannot remember. She says that she had the money in a vault of the Citizens' Savings & Trust Company, Chicago, that she had "saved it up," that Bessy did not return any part of it to her—owes it all now. Her testimony in regard to the source from which this money came and the correspondence with Bessy in regard to it is very unsatisfactory. She says that she had a letter telling her to send the money, but destroyed it. She admits that her testimony, taken at another time, in regard to the amount of money which she had, was untrue. The cashier of the Citizens' Trust & Savings Bank was examined, and stated that Esther Flower rented a box in its vault November 4, 1911. The transaction is involved in mystery and doubt. Where the money came from, in what form it was sent, whether in one check or draft as testified by Mrs. Flower, or in three, as Bessy Kaplon swears, at what bank in Chicago the check or checks were issued, are uncertain. Mrs. Flower says that she does not know; that although she has resided in Chicago a long time, had a box in the vault of the bank, she is unable to tell where, or in what form, she got the exchange, etc. The deposition of the clerk in the First National Bank of Chicago was taken. He says no such check was issued by that bank

on that or any other day. Bessy Kaplon says that she did not write to her sister for money to buy the goods, that she did not need it for that purpose, that at the time she wrote she did not intend to buy the goods; that she had at the time about $3,000 in her trunk; that her father owed her about $2,000, and she had money on deposit in banks in Chicago as much as $3,000. She says that, when she was married, her father gave her $6,000 as her "portion." "Mostly all bills, there was some little gold." She left a part of it with him, deposited some in bank, and always kept some in her trunk. She further says that she borrowed from one Louis Applefield $2,100, which she used in paying for the goods. She loaned Adolph Aarons, to help him pay for the Chase City stock, $1,434. Her testimony in regard to all of these matters is vague, uncertain, and frequently contradictory. Plaintiff took and read the deposition of her father, S. L. Levine. He says that he gave her some money at different times, that he has no memorandum or evidence of the dates or amounts of such gifts, that they may have amounted to $5,000 or $6,000. He denies that he had any money for her, or owed her any money. His testimony in regard to these matters is very indefinite and unsatisfactory, and in several material respects he contradicts his daughter. The testimony of the cashier of one of the banks, in which she says that she had money, was taken. He says that on July 11, 1911, she deposited in the bank $100, and on January 18, 1912, drew it out with the accrued interest. The cashier of the Kenwood Trust & Savings Bank says that she deposited but a small amount in that bank during the years 1908–1911, not exceeding $575. She drew out the balance $345.65 January 6, 1912. No other bank account in her name is found in Chicago. Thus but two sources remain from which she could have received the money with which she paid for the goods. In regard to the alleged money in her trunk she is not corroborated by a single witness. Her husband, she says, knew nothing of her having money in her trunk, although she claims to have kept it there during the period of her married life. The cashier of the Citizens' Bank of Wake Forest says that about the time of the purchase she spoke to him about borrowing a large sum of money, but nothing came of it. The cashier of another bank at Wake Forest says that she brought small bills to him to be exchanged for larger ones. I find it difficult to believe that her father gave her $6,000. There are many facts and circumstances in the record rendering it very improbable, nor can I find upon her uncorroborated testimony that she kept $3,000, or any like sum, in her trunk during the years of her married life, as she says. It is so unreasonable, and she makes so many statements in which she contradicts herself, and so many in which she is contradicted by those who would, if possible, corroborate her, that it is impossible to safely adopt her testimony as true. The cashier of the Citizens' Bank of Wake Forest says that about the time of the transaction in controversy she brought him $1,434 in currency, probably some in silver, which at her request he sent to the First National Bank at Chase City by express; that he did not send the same bills, but larger ones. Mr. Williams, president of that bank, says that this money was received and placed to the credit of Adolph Aarons and drawn out by him by check payable to Mr. Jeffries, assignee. The

check was drawn several days before the money arrived. The evidence shows that Aarons was relying on this money to use in part payment for the stock of goods there. The balance appears to have been paid from the proceeds of two notes of $500 each given by Aarons to the bank, indorsed by Moses Kaplon, and secured by a deed of trust on the goods. Aarons who lives in New York, left the goods in the possession of Moses Kaplon, who continued to sell them, and deposit the proceeds to Aarons' account. The notes were paid by checks on the account of Aarons, drawn by Moses Kaplon, in Aarons' name. Bessy Kaplon says of this money sent to Aarons that it was "money that I have had here for a long time. It was a part of the money that I had that my father gave me, had it ever since he gave it to me. I don't know where I kept it, most any place, kept it home in my trunk ever since I was married—five years ago. Don't think my husband knew it; think my father did; did not want to deposit in bank." She says that Aarons has paid her a part of the $1,434. She has no note or other evidence of the debt. He has promised to pay the balance in July. That Aarons, a merchant in New York, should come to Chase City for the purpose of buying a large stock of goods without having made any arrangement to pay for them, depending on borrowing the money from the daughter-in-law of the bankrupt debtor, and negotiating a loan for the balance at a local bank upon the indorsement of the debtor and a lien on the goods, excites suspicion that the entire transaction was for the "ease and benefit" of the insolvent debtor. This suspicion is vastly strengthened by all of the "facts and circumstances" surrounding the transaction.

Coming to the alleged loan by Louis Applefield of $2,100, defendant produced notes executed by her to Applefield and checks showing their payment. The testimony in regard to this transaction comes from Bessy Kaplon, and in this respect is important. At her examination taken before a commissioner (In re M. Kaplon & Co.) May 16, 1912, she says:

"I borrowed $2,100 from Louis Applefield of Baltimore. I don't know how long I had known him—about two or three years. He is a wholesale merchant. He was down here at the time. He just came down here. He travels all around, and he heard about the assignment being filed, and he said: 'If I were you, I would buy that stock of goods.' I said: 'I want to go to Chicago. I don't want to live here.' He said: 'I think you ought to buy it.' I said: 'Will you loan me the money?' He said: 'I will loan you all you want.' And he loaned me $2,100. *The day I borrowed the money I went over and he gave it to Mr. Brewer.* He was there when I signed the note. I gave him notes. I have just got through paying the notes, four notes. Three amounted to $500 and one $600. I paid the last May 10th. Business is so dull here. I had to draw money from Chicago, a thousand dollars, and gave it to Mr. Brewer. I drew it on the First National Bank of Chicago. I wrote to the bank in Chicago, and told them to send me the thousand dollars. * * * I certainly had money in Chicago. I did not want to take my money. Wanted to save it to educate my child."

Mr. Brewer says that Bessy Kaplon and Louis Applefield came into his bank and asked him to fill up a couple of drafts on Applefield in Baltimore, and to take off the interest on two or three notes. The drafts were paid. The bank books show a deposit by Bessy Kaplon

January 10th of $2,073.65. It will be observed that on January 8, 1912, Aarons wires from New York to Saul Kaplon at Wake Forest:

"Have wired Prof. G. per your letter, answer if sale postponed—then I will leave to-night. *Expect money from Applefield Tuesday in Wake Forest.*"

On the same day Bessy Kaplon buys the stock, and so wires Moses Kaplon at Chase City. Louis Applefield wires from Chase City to "Louis Applefield, Baltimore":

"Between January 2nd and 4th 1912. Have arranged everything satisfactory. Will leave for Durham to-morrow."

It is difficult to reconcile these facts. There is evidence tending to show that Applefield was about this time at Chase City, and that he and Aarons went together from there to Wake Forest. The telegram of January 8th, from Aarons to Saul Kaplon, indicates that he expected to get money from Applefield to buy the goods at Wake Forest. It is evident that Applefield did not reach Wake Forest until January 10, 1912. That is the date of the deposit by Bessy Kaplon of $2,073.75, as shown by bank book. It is evident that the transaction between Bessy Kaplon and Applefield took place on one day. This must have been January 10th. She says that they went to the bank. Mr. Brewer says that they came to the bank in the afternoon. Mr. Gulley says:

"The goods were sold on the 8th of January. The payment of $30 was made on the 8th and on the 10th. She paid the balance by check on the Citizens' Bank."

How is it possible to reconcile these indisputable facts with Bessy Kaplon's testimony in regard to the transaction between Applefield and herself? She had bought the goods two days before she saw Applefield at whose suggestion and upon whose offer to loan her the money she says she purchased them. Her statement as to the manner in which Applefield loaned her the money is unreasonable. That a business man should, almost accidentally, find himself in Wake Forest, find a stock of goods in the hands of an assignee, suggest to a young married woman, without consultation with her husband, as she says against the advice of her father-in-law, to buy a stock of goods for $3,723.29, and propose to loan her, on her own notes, without security, or the signature of her husband, $2,100, is a very remarkable transaction and calls for explanation, especially in view of the many and manifest contradictions found in the testimony of Bessy Kaplon in regard to the transaction. Applefield was with Aarons at Chase City, and in some way, and in regard to some matter, "arranged everything satisfactorily." It will be recalled that Aarons wires Saul Kaplon "expect to get money from Applefield," yet, when he buys at Chase City, he gets no money from Applefield, but borrows $1,434 from Bessy Kaplon, who, in turn, accepts Applefield's unsolicited offer to loan $2,100. Bessy Kaplon says that at that time she had $3,000 in her trunk, $1,200 in her father's hands, and $3,000 on deposit in Chicago banks. Why were all of these mysterious methods resorted to when she had ample money of her own to pay for the goods? Why send Aarons $1,434 and immediately borrow $2,100 from Applefield? Why did she not write to her father, or draw on the Chicago banks, or open her trunk and use her own money?

These questions demand plain, straightforward answers. Her father denies that he had any money for her, and the testimony from the banks shows that she had none there. She says that she paid Applefield the notes, and the checks produced show that she did so. She says that the last note was paid by money drawn from the First National Bank of Chicago. Her account at the Wake Forest Bank shows a deposit, April 3, 1912, of $1,000, but Mr. Givens of the Chicago bank says that she had no account there for the past five years. It is impossible to unravel the tangle into which the parties to these transactions have gotten it. It is equally impossible to escape the conviction that a fraud has been practiced upon the creditors of Moses Kaplon; that as to the Wake Forest stock the defendant Bessy Kaplon has either been an active participant or has been used by others who have profited by their fraudulent scheme. That Balkind, Aarons, and Applefield have not been called upon to explain their connection with these transactions, in which they are so closely connected, excites grave suspicion that they were active participants, if not the chief promoters of the conspiracy and its consummation. A very eminent judge has well said: .

"Fraud rarely lurks in the written agreement of parties, entered into at the end of their negotiations with each other, but almost universally precedes it, and consisting, as it must necessarily do in such case, of acts and declarations merely, it can only be exposed by allowing the conduct of the parties, their words and deeds throughout the entire treaty, to be shown to the jury. To hold the law to be * * * that because the negotiations of the parties culminated in a written instrument all inquiry into their preceding conduct is excluded would be to say that fraud by its very success might be made secure, unless, as can seldom happen, it would be detected in the mere words of the instrument." Ruffin, J., in Knight v. Houghtalling, 85 N. C. 17.

Applying this language to the disclosures in this record, it is difficult to avoid the conclusion that the execution of the notes to Applefield by Bessy Kaplon was the final means resorted to for the purpose of covering up and concealing the truth, that Applefield was a party to the scheme or conspiracy which found its consummation in the execution of the notes to him for the purpose of putting the stock of goods into the possession of Bessy Kaplon by the use of money which justly belonged to the creditors of Moses Kaplon. It may be that we have not been able to accurately interpret all of the facts and circumstances surrounding and permeating this transaction from start to finish. I cannot find that Bessy Kaplon had on January 8, 1912, the money which she claims derived from the sources claimed by her. I entertain a strong conviction that she and her husband have either made away with goods which in equity and justice belonged to the creditors of Moses Kaplon, or have used the proceeds of goods purchased and not paid for to consummate a fraud upon them. In either event, she is not, as against them or their representative the plaintiff, entitled to hold these goods as her property.

[2] To the suggestion that the trustee is estopped to prosecute this suit because, upon his motion, the judge of the District Court for the Eastern District of Virginia directed the assignee to pay the proceeds

of the sale into the court to await the final decree in the bankruptcy proceeding, of which that court has original jurisdiction, it is sufficient to say that the only effect of such order was to hold the money in custodia legis, to be disposed of as upon the final disposition of the case should be decreed. No estoppel can arise against the plaintiff by reason of that order. It appears that prior to the filing of the bill in this cause defendant Bessy Kaplon bought other goods and put them in the store with the stock purchased from the assignee. By direction of this court an inventory was taken in which these goods were separated from those purchased of the assignee. This has been done, and is on file. An order was also made permitting the defendant to sell the goods in the usual course of business, and keep and deposit the proceeds thereof in the bank under the supervision of Mr. Brewer, who has filed monthly statements of such sales, etc. A decree will be drawn adjudging that the goods sold by Mr. Donald Gulley, assignee of Moses Kaplon to Bessy Kaplon, were paid for by the money of Moses Kaplon, and that so much of said stock of goods as may be on hand shall be sold and the proceeds paid over to plaintiff, trustee. To the end that it may be ascertained what portion of the goods now on hand were of said stock and the same separated from such goods as were brought by defendant since January 10, 1912, a referee will be appointed to make such separation, with direction to ascertain the amount of sales that have been made since the order in this cause. The referee will take immediate possession of the goods now in the store and hold the same until the separation is made, not to exceed five days from the date of the interlocutory decree herein. This decree will further provide for a report by said referee within 10 days from its date. The cause will be retained for such further decree as upon the coming in of the report may be proper in the premises.